UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:25-cv-02437-RMR-STV

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

Plaintiff,

v.

PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado; and KRISTEN WOLF, RYAN LEYLAND, PATRICIA EVACKO, AVANI SONI, MICHAEL SCRUGGS, ALEXANDRA ZUCCARELLI, and JAYANT PATEL, in their official capacities as Members of the Colorado State Board of Pharmacy,

Defendants.

---

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS (ECF. No. 41, 09/26/25)**

---

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 4

I. THE FEDERAL 340B DRUG PRICING PROGRAM ........ 4

A. Contract Pharmacies Barge In On 340B's Comprehensive Scheme ........ 4

B. Manufacturers Attempt To Curb Abuse ........ 6

C. The Supreme Court Rules Federal Enforcement Is Exclusive ........ 9

II. COLORADO SENATE BILL 71 ........ 9

ARGUMENT ........ 10

I. PHRMA SUFFICIENTLY PLED ITS PREEMPTION CLAIM ........ 11

A. PhRMA Sufficiently Alleged That S.B. 71 Is Preempted ........ 11

B. Defendants' Other Counterarguments Fail ........ 18

III. PHRMA SUFFICIENTLY PLED ITS EXTRATERRITORIAL REGULATION CLAIM ........ 21

IV. PHRMA HAS STANDING ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

### CASES

*AbbVie Inc. v. Bailey*,
No. 24-cv-00996, 2025 WL 1918948 (E.D. Mo. July 11, 2025) ....25

*Ali v. Adamson*,
132 F.4th 924 (6th Cir. 2025)....12

*Arizona v. United States*,
567 U.S. 387 (2012)....11, 18

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)....1, 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....10

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025)....3, 21, 22, 23

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ....passim

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)....12, 13, 19

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)....12, 17

*Civil Rights Educ. & Enf't Ctr. v. Sage Hosp. Res.,*
222 F. Supp. 3d 934 (D. Colo. 2016) ....24

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025)....13

*Crandall v. Nevada*,
73 U.S. (6 Wall.) 35 (1867) ....13

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....11

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)....................1, 12

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)....................24

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................25

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003)....................15

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
804 F.3d 1090 (10th Cir. 2015)....................12, 19

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987)....................11, 14, 15

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)....................1, 11

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)....................21

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ....................passim

*Okla. Tax Comm'n v. Tex. Co.*,
336 U.S. 342 (1949)....................13

*Osborn v. Bank of the U.S.*,
22 U.S. (9 Wheat.) 738 (1824)....................13

*Pharm. Rsch. & Mfrs. of Am. v. Bailey*,
No. 24-cv-04144, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025) ....................23

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
760 F. Supp. 3d 439 (S.D.W. Va. 2024) ....................1, 6, 17, 18

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
538 U.S. 644 (2003)....................21

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ....................passim

*Santa Fe All. for Pub. Health v. Santa Fe*,
993 F.3d 802 (10th Cir. 2021)....................24

*South Carolina v. Baker*,
485 U.S. 505 (1988)....................12

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)....................21

*Styczinski v. Arnold*,
46 F.4th 907 (8th Cir. 2022)....................23

*United States v. Washington*,
596 U.S. 832 (2022)....................13

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
21 F.4th 1229 (10th Cir. 2021)....................24

*Wis. Dep't of Indus., Lab. & Human Rels. v. Gould Inc.*,
475 U.S. 282 (1986)....................18

*Wos v. E.M.A. ex rel. Johnson*,
568 U.S. 627 (2013)....................19

**STATUTES**

42 U.S.C. § 1396r-8(a)(1)....................4

42 U.S.C. § 256b....................1

42 U.S.C. § 256b(a)(1)....................passim

42 U.S.C. § 256b(a)(4)....................4

42 U.S.C. § 256b(a)(5)....................4, 15

42 U.S.C. § 256b(a)(8)....................25

42 U.S.C. § 256b(d)....................9

42 U.S.C. § 256b(d)(1)....................9, 18

42 U.S.C. § 256b(d)(3)....................9

## REGULATIONS

42 C.F.R. § 10.21(a)(1)....16

61 Fed. Reg. 43,549 (Aug. 23, 1996)....5, 6

89 Fed. Reg. 28,643 (Apr. 19, 2024)....18

90 Fed. Reg. 36,163 (Aug. 1, 2025)....9, 17

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V....4

U.S. Const. amend. XIV....4

U.S. Const. art. I, § 8, cl. 3....21

## INTRODUCTION

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") has sufficiently pled its merits claims and its Article III standing. PhRMA adequately pled that S.B. 71, which purports to graft *state law* requirements onto a *federal* Spending Power program, 42 U.S.C. § 256b ("340B"), and wrest control from the federal government, violates the U.S. Constitution's Supremacy Clause and its prohibition on extraterritorial regulation. *See Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024) (concluding similar state law regulating 340B program was likely preempted).

As PhRMA pled, Compl., ECF. No. 1, ¶¶ 3-6, 129, and has explained elsewhere, Pl.'s Mot. for Prelim. Inj. ("PI Br."), ECF No. 10, at 1-2, 5-6, 11-12; Pl.'s Reply in Supp. of Its Mot. for Prelim. Inj. ("PI Reply"), ECF No. 46, at 1, 3-6, 340B is an exclusively federal program, enacted under Congress's Spending Power. The federal government thus has extraordinary leverage to use the promise of federal funding to induce drug manufacturers to agree to obligations it could not impose on them directly. And since participation in a Spending Power program is in the nature of a contract, Congress must speak with special clarity when defining the conditions of participation. After all, "[r]ecipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand … the obligations' that would come along with doing so." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). So, if "Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*. S.B. 71, however, seeks to graft new obligations onto the exclusively federal 340B

program, altering the bargain drug manufacturers made when they signed the federal 340B agreement and the balance that was struck by Congress to induce participation. S.B. 71 is invalid for that reason alone.

While that is sufficient to withstand Defendants' motion to dismiss, S.B. 71 also runs afoul of traditional preemption principles. It invades a uniquely federal field. And it conflicts with 340B in numerous ways. The obligation Congress imposed on manufacturers in 340B is to "offer" certain drugs for sale to certain entities at the federal 340B price. *See* 42 U.S.C. § 256b(a)(1); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460-64 (D.C. Cir. 2024). That obligation is limited: Manufacturers have the right to set other reasonable, non-price terms in their offers. *Novartis*, 102 F.4th at 460-64. So long as the offer to sell at the 340B price remains "bona fide" in light of those other terms, a manufacturer has discharged its 340B obligation. *Id.*

S.B. 71 fundamentally alters that bargain by deeming illegal certain reasonable manufacturer conditions in a 340B offer. But multiple federal appellate courts have already addressed this issue and concluded manufacturers have the right to include reasonable conditions in their 340B bona fide offers, including a one contract pharmacy limitation and a claims data requirement. *Id.*; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-06 (3d Cir. 2023). Colorado outlaws those specific, federally sanctioned limitations on a manufacturer's federal 340B offer, setting up a clear and direct conflict with federal law.

By outlawing reasonable conditions, S.B. 71 compels manufacturers to sell more drugs at the reduced 340B price than Congress requires and manufacturers agreed to

when they signed up to participate in 340B. Compl. ¶¶ 7-13; PI Br. at 14-20; PI Reply at 5, 7-8. S.B. 71 also restricts manufacturers' ability to include claims data conditions in their 340B offers, although it is essential to 340B's functioning that manufacturers have access to information on the prescriptions for which 340B pricing is sought. Compl. ¶¶ 85, 90-92, 139, 144, 146; PI Br. at 3, 8, 17-21; PI Reply at 9-11. And by injecting state decision-makers into 340B, S.B. 71 conflicts with 340B's exclusive federal administration and enforcement regime by usurping the sole authority of the federal agency that administers 340B, the U.S. Department of Health and Human Service ("HHS"), to address the very same conduct S.B. 71 covers. Compl. ¶¶ 16-17, 48-55, 116-23, 131-32, 137-38, 151-55; PI Br. at 4, 22-24; PI Reply at 2, 11-13.

PhRMA also sufficiently pled that S.B. 71 violates the U.S. Constitution's prohibition on extraterritorial regulation. Almost all pertinent manufacturer transactions occur outside Colorado between out-of-state manufacturers and out-of-state distributors which in turn handle sales of drugs to covered entities and pharmacies, some of which are located in Colorado. Compl. ¶¶ 158-67. As the Eighth Circuit recently held, *Association for Accessible Medicines v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025), *reh'g denied,* No. 24-1019, 2025 WL 2178535 (8th Cir. Aug. 1, 2025), such laws that directly regulate out-of-state drug sales and pricing are unconstitutional.

Finally, for the reasons identified above and detailed below, PhRMA has standing. S.B. 71 requires PhRMA's members to make many additional reduced-priced sales that are *not* required under 340B. That is clear economic harm, and gives rise to standing.

Defendants' motion to dismiss should be denied.

## BACKGROUND

### I. THE FEDERAL 340B DRUG PRICING PROGRAM

#### A. Contract Pharmacies Barge In On 340B's Comprehensive Scheme

To receive federal Medicaid or Medicare Part B reimbursements, manufacturers must sign the federal 340B agreement and opt into the program. 42 U.S.C. §§ 256b(a)(1),1396r-8(a)(1); Compl. ¶ 46. The federal statute and agreement require that the manufacturer "shall offer" 340B-priced drugs to a statutory 15 types of healthcare providers ("covered entities"). 42 U.S.C. §§ 256b(a)(1), (4); Compl. ¶¶ 39-41. That is not something Congress or an agency (or a state) can simply mandate without a manufacturer's opt-in without raising serious constitutional concerns. *See* U.S. Const. amends. V, XIV; Compl. ¶ 6. And because manufacturer participation in Medicare, Medicaid, and 340B rise and fall together, Congress needed to ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of 340B participation. *See* Compl. ¶¶ 12, 131. That is why, among other things, Congress narrowly circumscribed the entities eligible for 340B prices. *Id.* ¶¶ 131, 139. As relevant here, pharmacies are not included. 42 U.S.C. § 256b(a)(4); Compl. ¶ 41.

Congress also tried to ensure that HHS would police the inevitable temptation for entities like pharmacies to try to get the benefits of 340B pricing. To that end, in 42 U.S.C. § 256b(a)(5) (known as the "diversion" provision), Congress prohibited a covered entity from reselling or transferring a 340B-priced drug to any person other than a "patient" of that entity. Compl. ¶¶ 9, 40, 139. In 1996, HHS addressed whether a covered entity without an in-house pharmacy could contract with one—but only one—outside pharmacy

to dispense 340B-priced drugs to its patients. *Id.* ¶ 93. The agency reasoned that, if such a pharmacy was contractually an "agent" of the covered entity, and the entity retained title to the drugs at all times before they were dispensed to its patients, then such an arrangement would not violate the diversion provision. 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996). Concerned about the risk of diversion, however, HHS permitted each covered entity to have a maximum of one contract pharmacy. *Id.* at 43,555.

These requirements applied for 14 years, until the agency "swerved" and changed its guidance, allowing an unlimited number of contract pharmacies for each covered entity. *Novartis*, 102 F.4th at 457-58. Thereafter, the number of contract pharmacies exploded, as (predictably) did the number of claims for 340B pricing—meaning that the cost to manufacturers skyrocketed, even though the patient population of covered entities did not expand at anything approaching the same rate. *Id.*; Compl. ¶¶ 59-62. By 2020, the number of contract pharmacy arrangements had increased to over 27,000 from 1,300 in 2010. Compl. ¶ 61. As the Government Accountability Office ("GAO") and the HHS Inspector General have explained, many for-profit pharmacies—including the largest chains—recognized that if they could insert themselves into 340B, they could acquire drugs at 340B prices, sell them at or near full price, and pocket a portion as profit. *Id.* ¶¶ 59-62; *Novartis*, 102 F.4th at 456-58.

This explosion ballooned 340B's size and dramatically increased the risk of abuse. Compl. ¶¶ 59-62, 71, 74, 79-81. In a GAO study, contract pharmacies accounted for nearly two-thirds of unlawful diversion violations. *Id.* ¶ 62 ("The expansion of contract pharmacies … increases potential … risks related to diversion and duplicate discounts.").

The opportunity for abuse is even more acute given most contract pharmacies' use of the product "replenishment model." *Id.* ¶¶ 63-71. Although HHS directed that covered entities should retain title to 340B-priced drugs and require contract pharmacies to operate as their agents, 61 Fed. Reg. at 43,550, 43,553, the product replenishment model jettisons these limitations. Compl. ¶ 67. Using this model, contract pharmacies dispense drugs from their general inventories to all customers. *Id.* ¶¶ 63-66. On the back end, contract pharmacies use undisclosed algorithms to purport to retroactively identify customers that may have some relationship to a covered entity and restock their general inventories with 340B-priced drugs based on the outcome. *Id.*; *Novartis*, 102 F.4th at 457-58. This black-box system creates more opportunities for diversion. Compl. ¶¶ 64, 79-80. It also results in greater profits, incentivizing "catalog[ing] as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58; Compl. ¶¶ 63-78. But these price reductions usually are not passed on to patients because drugs come out of a pharmacy's general inventory and 340B pricing is not applied until after patients depart. Compl. ¶¶ 73-77; *Morrisey*, 760 F. Supp. 3d at 447.

### B. Manufacturers Attempt To Curb Abuse

Eventually, drug manufacturers concerned with diversion and illegal duplicate discounts associated with contract pharmacies individually implemented their own policies to identify and address these problems. *Novartis*, 102 F.4th at 457-58. In 2021, HHS intervened, issuing violation notices to manufacturers seeking to compel them to offer and deliver 340B-priced drugs to *all* covered-entity contract pharmacies. Compl. ¶ 94.

Litigation followed, with key decisions in the U.S. Courts of Appeals for the Third Circuit and the D.C. Circuit. *Id.* ¶¶ 96-103. The central legal question in each of these cases was whether the federal government could mandate an "unlimited" contract pharmacy delivery requirement. Both Circuits said "no."

In *Sanofi*, the Third Circuit explained that Congress contemplated "one-to-one" relationships between manufacturers and covered entities in the 340B program, "without mixing in a plethora of pharmacies." 58 F.4th at 704-05. No language in the federal statute expressly addressed delivery to contract pharmacies—it is silent on that topic—and an unlimited contract pharmacy mandate could not be justified based on statutory text or structure. *Id.* at 703-06. But *Sanofi* recognized that a federal contract pharmacy delivery mandate might be appropriate on a smaller scale—for example, when a covered entity did not have any in-house pharmacy and thus could not "accept" a drug manufacturer's 340B offer without having ***one*** contract pharmacy to dispense the drugs. *Id.* Accordingly, *Sanofi* explains how "delivery" to a contract pharmacy falls within the realm of HHS's authority (and outside of regulation by a state). *See id.*

In *Novartis*, the D.C. Circuit went a step further. It first agreed with *Sanofi* that the 340B statutory text could not support HHS's *unlimited* contract pharmacy mandate. 102 F.4th at 460-64. Again, Congress had not identified contract pharmacies or delivery to those pharmacies in the statute. But HHS also specifically asked the court to answer a separate question under 42 U.S.C. § 256b(a)(1) of the federal statute: Could the manufacturers lawfully condition their federal offers on a "one contract pharmacy" delivery limitation, and "claims data" precondition? *Novartis*, 102 F.4th at 460-64.

*Novartis* clarified the law by answering that question in Sections 4 and 5 of its opinion. *Id.* at 463-64. Congress left manufacturers a degree of discretion to structure their 340B offers under 42 U.S.C. § 256b(a)(1), but such offers must still be "bona fide" and consistent with the federal statute. *Id.* at 462-64 (describing manufacturers' ability to put certain reasonable conditions on their federal 340B offers). The court then held that the two conditions at issue—a "one contract pharmacy" limitation and a requirement to provide "claims data"—met that test. *Id.* at 460-64. In other words, the manufacturer could offer to sell at 340B prices and deliver only to the covered entity or one contract pharmacy of the entity's choice. *Id.* As the court explained, the agency itself had enforced a one contract pharmacy limit for more than a decade. *Id.* at 461. Likewise, a manufacturer may condition its offer to sell at 340B prices on the covered entity providing "claims data"—information about the prescriptions at issue. *Id.* at 463. Claims data not only is readily accessible from pharmacies and can be provided with minimal burden, but is key to the operation of the federal enforcement regime. *See infra* at 16-17.

Thus, under federal law, a manufacturer may make a 340B offer with these reasonable contractual conditions, which satisfies a drug manufacturer's duty to make an offer under Section (a)(1) of the federal statute and its federal agreement with HHS. Compl. ¶¶ 10, 99, 101-04, 139. Once such an offer is made, the manufacturer's "shall offer" obligations are discharged. *Novartis*, 102 F.4th at 460-64. If such an offer is not accepted by a covered entity, there is no sale of a 340B-priced drug. *See id.*

Recently, HHS also launched a Rebate Model Pilot Program, permitting specific conditions on 340B offers—including claims data requirements and 340B price reductions

through rebates—by certain manufacturers on qualifying drugs. *See* 90 Fed. Reg. 36,163, 36,163-65 (Aug. 1, 2025). These models and conditions are intended to detect and prevent duplicate discounts (including duplicate discounts under the Inflation Reduction Act ("IRA")) and diversion. *Id.*; Compl. ¶ 110; *see infra* at 16-17.

### C. The Supreme Court Rules Federal Enforcement Is Exclusive

Congress amended the 340B statute in 2010, creating a new comprehensive and exclusive remedies process, *see* 42 U.S.C. § 256b(d), with several unique features. That process is required to be iterative, with informal dispute resolution, corrective actions, audits, adjustments, and refunds all preceding any assessment of civil penalties. *Id.* § 256b(d)(1)(B)(v)-(vi); *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 121-22 (2011). Issues related to 340B compliance and obligations raised by covered entities or manufacturers are to be resolved through Administrative Dispute Resolution ("ADR"). 42 U.S.C. § 256b(d)(3)(A). HHS decisions on these issues are final, subject only to federal court review. *Id.* § 256b(d)(3)(C); Compl. ¶¶ 53-54. HHS described these federal processes as *the exclusive remedies* for any disputes regarding contract pharmacies and has sought to structure its regulations to address them. Compl. ¶¶ 55, 130-31.

## II. COLORADO SENATE BILL 71

S.B. 71 directly regulates participation in 340B; indeed, S.B. 71 has no effect unless a manufacturer participates in 340B. S.B. 71 Sec. 2, 6-29-103(2); Compl. ¶¶ 113-15. S.B. 71 instructs that "a manufacturer … shall not … deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity,

or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs." S.B. 71 Sec. 2, 6-29-105(1)(a). It also provides that "[a] manufacturer shall not … require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data … or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law." *Id.*, Sec. 2, 6-29-105(1)(b). In other words, it bars manufacturers from limiting the number of contract pharmacies or requiring claims data—the very same conditions that courts have held manufacturers *may* impose under federal law. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06; Compl. ¶¶ 141-50.

S.B. 71 provides for a private cause of action, allowing any 340B covered entity or contract pharmacy to sue for failure to comply with Colorado's conditions on participation in 340B. Colo. Rev. Stat. §§ 6-1-112(1), -113(1). Put differently, S.B. 71 empowers 340B entities to do what the Supreme Court warned against—circumventing the exclusive agency enforcement system. *Astra*, 563 U.S. at 118. Manufacturers are also subject to penalties of up to $20,000 per "violation," with "[e]ach package of a 340B drug" constituting a violation. S.B. 71 Sec. 2, 6-29-105(3)(b); Colo. Rev. Stat. § 6-1-112(1)(a).

## ARGUMENT

PhRMA's complaint contains factual allegations that, accepted as true, state a claim to relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I. PHRMA SUFFICIENTLY PLED ITS PREEMPTION CLAIM

Defendants largely fail to address the overarching thrust of PhRMA's preemption claim—that Colorado cannot rewrite the terms of a federal Spending Power program. That alone is sufficient to deny Defendants' motion to dismiss this claim.

Nor do Defendants' other counterarguments undermine PhRMA's traditional preemption arguments. A state law is field preempted where (1) Congress's "framework of regulation [is] 'so pervasive' that Congress left no room for the States to supplement it,'" or (2) where there is a "federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Similarly, a state law is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987), or interferes with a private party's rights conferred by federal law. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477-78 (2018). S.B. 71 is preempted on both fronts.

### A. PhRMA Sufficiently Alleged That S.B. 71 Is Preempted

As PhRMA pled and explained, 340B is solely a creature of federal law and an exercise of Congress's Spending Power. Compl. ¶¶ 3-6, 129; PI Br. at 1-2, 5-6, 11-12; PI Reply at 1, 3-6. Congress utilized its Spending Powers here to "regulate where it otherwise could not—beyond its enumerated powers, in other words—by imposing conditions on federal funds," provided manufacturers "consent[ed] to the bargain." *Ali v.*

*Adamson*, 132 F.4th 924, 931 (6th Cir. 2025) (citation modified). As a result, the obligations imposed via participation in 340B must be imposed "unambiguously" by Congress. *Cummings*, 596 U.S. at 219-20; *Arlington*, 548 U.S. at 296.

The Supreme Court has consistently rejected state efforts to regulate a program or relationship that "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988). So, in a federal program, particularly one enacted under Congress's Spending Power, "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle*, 487 at 504; *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1096 (10th Cir. 2015) (same). Because states lack the power to directly regulate the federal program or relationship itself, "no presumption against pre-emption obtains in this" context. *Buckman*, 531 U.S. at 348. Quite the opposite: In cases like this one where a state has directly targeted a federal Spending Power program, "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption," because the uniquely federal interest in "obligations to and rights of the United States" "changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U.S. at 504, 507-08.

This time-tested approach to evaluating state laws that directly target federal programs makes sense, given that states lack authority to single out for special regulation "the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Consistent with that principle, the Supreme Court has held time and again that states may not "control" federal operations by regulating those that contract with the

federal government to advance federal objectives. *See Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867); *Okla. Tax Comm'n v. Tex. Co.*, 336 U.S. 342, 364 (1949). Such discrimination occurs where a state law "singles" out those contracted with the federal government "for less favorable treatment" or "regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 839 (2022); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025).

Accordingly, states may not upset the bargained-for consideration of an exclusively federal contract and rewrite private parties' agreements with the federal government. *See Boyle*, 487 U.S. at 504. S.B. 71 is not a law of general applicability; it is targeted *only* at 340B, a program enacted under the federal Spending Power, and *only* at manufacturers who opt into that program. 42 U.S.C. § 256b(a)(1); Colo. Rev. Stat. § 6-29-103(2) (defining "drug" with reference to 340B). In other words, S.B. 71 is directly aimed at, and parasitic to, 340B—and 340B alone. And Colorado's law adds materially different and *undisclosed* obligations to the bargain manufacturers made when they signed the federal 340B agreement. S.B. 71 significantly changes the terms of manufacturers' participation in 340B without Congress having authorized, much less unambiguously, these new obligations. Defendants offer no responsive argument. That alone warrants denial of the motion as to the preemption claim.

S.B. 71 also fails under more general preemption principles. As PhRMA pled and explained (PI Br. at 4, 22-24; PI Reply at 2, 11-13), S.B. 71 impermissibly attempts to rewrite both the substantive and enforcement terms of a federal program. *See* Compl.

¶¶ 16-17, 48-55, 116-23, 131-32, 137-38, 151-55. Congress chose to utilize an offer-acceptance framework for 340B as the "method" to achieve its objectives. *Int'l Paper*, 479 U.S. at 494. Specifically, as the D.C. Circuit explained, Congress set the governing constraints on how manufacturers may operate vis-à-vis "offers" of 340B-priced drugs—offers must be "bona fide." *Novartis*, 102 F.4th at 462-64.

But manufacturers retain flexibility to impose "conditions on the distribution of covered drugs." *Id.* at 464. And as two federal appellate courts found, these permissible conditions include a one contract pharmacy limitation and a claims data requirement. *Id.* at 463-64; *Sanofi*, 58 F.4th at 703-06. If a covered entity does not accept these permissible federal conditions in a 340B offer, no sale at the 340B price is required or occurs. *Novartis*, 102 F.4th at 459; *Sanofi*, 58 F.4th at 704-06; Compl. ¶¶ 12, 92, 98.

S.B. 71 modifies the obligation Congress imposed and manufacturers agreed to—to "offer" the drugs at 340B prices, subject to reasonable conditions—by outlawing the same one contract pharmacy limitations and a claims data requirements federal courts have already held Congress allowed manufacturers to impose, skewing Congress's chosen balance. The result, then, is that S.B. 71 compels vastly more 340B-priced sales than federal law. Compl. ¶¶ 7, 12, 92, 126, 132-35. Without S.B. 71, there would be no sale at the 340B price when a covered entity refuses to accept a one contract pharmacy limitation or a claims data requirement: that is a rejection of the 340B offer, and there is no 340B purchase to which the 340B price attaches. With S.B. 71, however, a purchase at the 340B price *would* occur: S.B. 71 bars manufacturers from imposing federally lawful conditions and, as a result, covered entities can accept the offer without those conditions.

Indeed, S.B. 71 defines 340B-priced drugs to include drugs that "would have been purchased but for [a] restriction" outlawed by S.B. 71. Colo. Rev. Stat. § 6-29-103(2). That makes clear S.B. 71 sweeps in drugs that would not otherwise have been purchased through 340B. By compelling many more reduced-price 340B transactions that would not otherwise occur under federal law, S.B. 71 expands the scope of manufacturers' 340B obligations and fundamentally alters the federal bargain struck. Compl. ¶¶ 4, 7-13, 92, 126, 132-35; PI Br. at 14-20; PI Reply at 5, 7-8; *see Int'l Paper*, 479 U.S. at 494 (state law preempted where it "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *Forest Park II v. Hadley*, 336 F.3d 724, 730, 732-33 (8th Cir. 2003).

Defendants' primary response to all of this (at 13, 16-18) is that 340B is supposedly "silent" on the issue of delivery, and so Colorado and other states can regulate delivery to fill in this alleged statutory silence. But *Novartis* makes clear that is incorrect and analyzes in detail how the federal regime *does* address these issues. That case involved HHS's attempt to impose an *unlimited* contract pharmacy requirement on manufacturers, which the court rejected as inconsistent with the "shall offer" provision in 42 U.S.C. § 256b(a)(1). *Novartis* explained how 340B addresses delivery to contract pharmacies under Section (a)(1) of the federal statute, and through the Section (a)(5) ban on diversion. 102 F.4th at 460-64. And *Novartis* and *Sanofi* both indicate that the federal government *does* have authority over delivery to contract pharmacies in specified circumstances, namely (1) to ensure an offer remains bona fide, it could require delivery of 340B-priced drugs to *one* contract pharmacy, and (2) it could prohibit certain delivery

conditions that alter the federally-mandated 340B price (*e.g.*, mandating delivery be accepted in another country). Accordingly, any more limited obligation must come from HHS, subject to review by the federal courts. Indeed, as the D.C. Circuit explained, federal "courts can sensibly adjudicate questions like these" about permissible delivery restrictions. *Novartis*, 102 F.4th at 462-463. Federal regulations reinforce this, demonstrating HHS believes it has authority to regulate in this space via ADR as well. 42 C.F.R. § 10.21(a)(1) (federal remedies process covers claims "that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"); Gov't Reply Br. at 5, *Am. Hosp. Ass'n v. HHS*, No. 3:20-cv-08806 (N.D. Cal. Feb. 1, 2021), ECF No. 82 (noting ADR is forum for disputes over contract pharmacy policies); Compl. ¶¶ 105-6 (covered entities have brought ADR claims about manufacturers' one contract pharmacy policies).

Those are the processes the federal government has deemed correct to determine the extent to which contract pharmacy use might be appropriate in 340B and which create the body of federal law applicable here. And those processes are functioning as intended, *see Novartis*, 102 F.4th at 460-64; Colorado simply does not like the result. But that does not create a gap that Colorado can fill. *See Astra*, 563 U.S. at 120 ("With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial.").

S.B. 71's restriction on manufacturers' gathering of information is preempted for additional reasons too. As PhRMA explained (PI Br. at 3, 8, 17-21; PI Reply at 9-11) and pled (Compl. ¶¶ 85, 90-92, 129-30, 138-39, 144, 146), claims data is central to accessing the federal remedial regime, including obtaining an audit and thus accessing ADR, and is

a key facet of HHS's recently announced Rebate Model Pilot Program, which helps manufacturers subject to the IRA avoid duplicate discounting through use of rebates and claims data collection. *See* 90 Fed. Reg. at 36,163-65. This claims data includes industry-standard information like the date of service, date of prescribing, national drug code, prescriber and service provider ID, and 340B ID, among other things. *Id.* at 36,165. S.B. 71's bar on claims data conditions upends all of this. Compl. ¶¶ 104-11, 146-50.

Finally, S.B. 71 also intrudes on and conflicts with Congress's chosen scheme of exclusive federal oversight. *See Astra*, 563 U.S. at 113, 120; *see also Buckman*, 531 U.S. at 349-50. S.B. 71 adds another method through which 340B can be enforced. Colorado thus renders non-exclusive HHS's authority to make discretionary judgments regarding enforcement, transfers to state courts the federal courts' authority to determine the limits of 340B's obligations, and ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid. *See Astra*, 563 U.S. at 120. And it does so in precisely the way that *Astra* found problematic. *See id.* ("Recognizing the [] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits[.]"). Permitting state intervention in this process would destroy the federal government's unified control over 340B. That is precisely what the *Morrisey* court held, recognizing *Astra*'s "holding … controls." 760 F. Supp. 3d at 458.

Because 340B "[p]rice regulation is exclusively controlled by the federal statute, … state enforcement of it would necessarily intrude on the federal [340B] scheme." *Id.* That is reinforced by the federal government's own position: Regulations issued in 2024 make clear HHS's view it has statutory authority to address the same issues as S.B. 71,

including through ADR. 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024); 42 U.S.C. § 256b(d)(1). Colorado's regulation of these same issues thus intrudes on the federal government's exclusive enforcement authority.

But the conflicts do not end there. State adjudication in this space also raises the threat of inconsistent adjudications like those that motivated *Astra*'s holding. *Astra*, 563 U.S. at 120; *Morrisey*, 760 F. Supp. 3d at 455-56. Determining whether a manufacturer violated S.B. 71 requires determining if there was an underlying 340B obligation in the first place. That determination requires adjudication of a whole host of federal law issues under 340B that are committed to HHS, overseen by federal courts. Compl. ¶¶ 16-17, 48-55, 116-23, 131-32, 137-38, 151-55; PI Br. at 4, 22-24; PI Reply at 2, 11-13. This conflict strikes at the heart of the federal government's ability to uniformly apply and enforce 340B nationwide. *Arizona*, 567 U.S. at 406-7; *Wis. Dep't of Indus., Lab. & Human Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986). And it ultimately compromises the federal government's ability to balance the interests of 340B, Medicare, and Medicaid, precisely in the way that *Astra* found problematic. 563 U.S. at 120; *Morrisey*, 760 F. Supp. 3d at 456-58. All of those conflicts support preemption.

### B. Defendants' Other Counterarguments Fail

Although Defendants still do not address PhRMA's central argument regarding preemption, they re-advance several unavailing counterarguments. None hold up to scrutiny.

First, Defendants assert (at 11-12), that the presumption against preemption saves S.B. 71. That is incorrect: In the context of a federal program enacted under Congress's

Spending Power, the presumption runs in the opposite direction and mandates that state law cannot supplant federal law under Supreme Court precedent. *Supra* at 12. Tenth Circuit precedent reinforces this: In *Helfrich*, the Court applied *Boyle* in the context of a federal contract covering health insurance for federal employees. 804 F.3d at 1095-99. The court noted the uniquely federal interest in attracting federal workers. *Id.* at 1098. And it also observed that there was "a strong federal interest in uniformity" across state lines. *Id.* at 1099. The same is true here. Changing the terms of 340B impacts the ability to retain manufacturers' 340B participation. And there is a strong interest in uniform administration and enforcement of 340B. *Astra*, 563 U.S. at 119-21.

Defendants incorrectly label (at 11) S.B. 71 as a regulation of public health and safety. But this is *not* a generally applicable health or safety law: It targets the federal program directly and applies *solely because manufacturers participate in 340B*. And the label a state attaches to its law does not govern the preemption analysis. Instead, a court looks to see whether the state law targets an area of unique federal concern. *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 639-40 (2013) ("Pre-emption is not a matter of semantics. A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect."). S.B. 71's intended operation and effect is to expand the scope of manufacturers' 340B pricing obligations and to require manufacturers to provide 340B-priced drugs where federal law does not. That is what counts.

*Second*, Defendants assert (at 20) that S.B. 71's claims data restriction cannot be preempted because it does not outlaw 340B audits. But that argument is a non-sequitur.

S.B. 71 need not outlaw 340B audits to nonetheless stand as an obstacle to utilizing the audit mechanism. In any case, this is the same sort of impermissible creative drafting barred by Supreme Court precedent. *Supra* at 19. In Colorado's view, it may not be able to directly bar audits, but it can cut off access to the data needed to obtain an audit. Again, that is a distinction without a difference—Colorado seeks to accomplish the same end, in a roundabout way. And Defendants tellingly fail to address the conflict created with the IRA and HHS's Pilot Program. As PhRMA pled and explained, that Pilot Program explicitly contemplates the collection of claims data to help manufacturers comply with the IRA and 340B. S.B. 71, however, upends the Pilot Program by prohibiting collection of the very data necessary to make it work. Compl. ¶¶ 15, 108-11, 149-50. Defendants' lack of answer is, again, sufficient to deny the motion.

*Finally*, Defendants contend (at 19-20) that enforcement of 340B and S.B. 71 "concern two very different areas." PhRMA already explained that the two statutes govern the same conduct and that HHS has asserted authority to govern in this area. Compl. ¶¶ 4, 12, 92, 128; PI Br. at 9-11; PI Reply at 11-13. And Defendants nowhere explain how violations of S.B. 71 could be adjudicated without answering numerous questions of federal law regarding 340B, given S.B. 71 expressly relies on 340B. *Supra* at 17-18. Instead, Defendants assert (at 19) that "[a]ny questions about diversion or compliance with federal pricing requirements are matters for federal enforcement unrelated to S.B. 71." That means Colorado would find liability under state law without ever determining underlying federal 340B questions, such as whether the purported covered entity qualified under federal law as a 340B covered entity or whether the individual who

received the drug qualified as a covered entity "patient." Compl. ¶ 123 (federal law questions required). That presents a profound conflict, as Defendants make clear they intend to hold manufacturers *liable* for conduct *even when* there is no 340B eligibility.

## III. PHRMA SUFFICIENTLY PLED ITS EXTRATERRITORIAL REGULATION CLAIM

PhRMA also sufficiently pled that S.B. 71 impermissibly regulates extraterritorial conduct. Since ratification of our Nation's Constitution, the states have been governed by a fundamental principle: no state can regulate conduct outside its boundaries. *See, State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). This principle flows both from the Constitution's Commerce Clause, which gives our federal government responsibility for regulating commerce among the states and from several other Constitutional provisions. U.S. Const. art. I, § 8, cl. 3; *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023); *Accessible Meds.*, 140 F.4th at 959.

S.B. 71 violates these principles. As *Pork Producers* and *Accessible Medicines* reinforce, a state cannot "*directly* regulat[e] transactions which take place wholly outside the State." *Accessible Meds.*, 140 F.4th at 961 (quoting *Pork Producers*, 598 U.S. at 376 n.1). Nor does a state have the "power to project its legislation into another state by regulating the price to be paid in that state." *Id.* at 960 (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)); *id.* at 961 (*Pork Producers* "'sa[id] nothing new' about the extraterritoriality doctrine" (quoting *Pork Producers*, 598 U.S. at 374)).

*Accessible Medicines* is particularly instructive here: The court held that a state cannot regulate transactions between drug manufacturers and distributors occurring out of state, even if the drugs at issue are eventually sold in the regulating state. That case

involved a Minnesota law prohibiting manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase … on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1). Minnesota sought to defend its statute by arguing that it applied only to drugs ultimately sold to consumers in Minnesota. *Id.* at 960. But that was not enough to avoid the Constitutional problem. What mattered was where the conduct that the statute prohibited occurred. Because the statute prohibited a manufacturer's sale at an "excessive" price, the relevant location was the location of the manufacturer's sale. *Id.* at 959-60. Because an out-of-state "manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act," the law violated the dormant Commerce Clause for two separate reasons: it "*directly* regulate[d] transactions which t[ook] place wholly outside the State" and it had "the specific impermissible extraterritorial effect of controlling prices outside of Minnesota." *Id.* at 959, 961. That the drugs later "ended up in Minnesota" was irrelevant. *See id.* at 959-60.

S.B. 71 violates the Constitution for the same reasons as in *Accessible Medicines*. As there, PhRMA's members and the main distributors to which they sell are all located outside of Colorado. Compl. ¶¶ 163-66. Pharmacies and healthcare providers then purchase PhRMA's members' drugs from these out-of-state distributors. *Id.* ¶ 165. Although the financial flows are complex, the bottom line is that distributors do not pay manufacturers more for drugs than the amount for which they sell them. So when S.B. 71 mandates that a particular drug be sold by a manufacturer at the 340B price instead of a commercial price, a corresponding price reduction for the drug must also occur between

the out-of-state manufacturer and out-of-state distributor. Compl. ¶¶ 159-67. Those transactions occur entirely outside Colorado.

So, the fundamental problem is that S.B. 71 "*directly* regulate[s] transactions which take place wholly outside [Colorado]." *Accessible Meds.*, 140 F.4th at 961. And by requiring manufacturers to change their pricing practices, S.B. 71 also has "the specific impermissible extraterritorial effect of controlling prices outside of [Colorado]." *Id.* at 960. Colorado cannot dictate to manufacturers how they conduct business outside Colorado.

If anything, the case for S.B. 71 violating the Constitution is stronger than in *Accessible Medicines*. The law there at least required a drug at some point to be "sold, dispensed, or delivered … in the State." 140 F.4th at 958-59 (quoting Minn. Stat. § 62J.842 subd. 1). S.B. 71 contains no geographic limitations. *See* S.B. 71 Sec. 2, 6-29-103(1) (incorporating federal definition of "covered entity" which applies nationwide). Even if S.B. 71 were limited to drugs ultimately purchased by Colorado covered entities, extraterritoriality problems would remain given Colorado covered entities contract with out-of-state pharmacies. Compl. ¶¶ 168-70. Even if these pharmacies provide drugs to Colorado patients of Colorado covered entities, Colorado cannot regulate these far-flung transactions. *Styczinski v. Arnold*, 46 F.4th 907, 912-14 (8th Cir. 2022) (holding Minnesota lacked power to regulate transaction with Minnesota resident in Nevada). PhRMA's allegations are sufficient. *Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 24-cv-04144, 2025 WL 644281, at *6 (W.D. Mo. Feb. 27, 2025) (denying motion to dismiss).

## IV. PHRMA HAS STANDING

Defendants argue (at 6-10) that PhRMA lacks standing because its injury is not

traceable to S.B. 71. That is incorrect. An organizational plaintiff has standing where its members have "[1] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021).[1]

These requirements are satisfied: Under 340B, PhRMA's members can impose reasonable conditions limiting the number of contract pharmacies per covered entity and requiring covered entities to provide claims data. Compl. ¶¶ 84-95. S.B. 71 bars these conditions in a 340B offer, resulting in the sale of many more 340B-priced drugs than would be required if 340B functioned as Congress designed it and, consequently, in economic losses to PhRMA's members. *Id.* That is classic Article III injury. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("[A] loss of even a small amount of money is ordinarily an 'injury.'"). And the harm is "fairly traceable" to S.B. 71, because the law's point is to force additional 340B-priced sales. *Santa Fe All. for Pub. Health v. Santa Fe*, 993 F.3d 802, 814 (10th Cir. 2021) (Harm is "fairly traceable" if government action is "a 'but for' cause."); Colo. Rev. Stat. § 6-29-103(2) (defining "drug" to include those that "would have been purchased but for [a] restriction" S.B. 71 bars). Enjoining S.B. 71 redresses that harm by stopping these transactions. *FDA v. All. for Hippocratic*

---

[1] Defendants incorrectly assert without elaboration (at 7) that this suit requires individual member participation. *Civil Rights Educ. & Enf't Ctr. v. Sage Hosp. Res.*, 222 F. Supp. 3d 934, 943 (D. Colo. 2016) (relief sought here does not require individual participation).

*Med.*, 602 U.S. 367, 382 (2024) ("*AHM*") ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish."). An injunction also remedies compliance costs, like policy changes, produced by S.B. 71.

Defendants' reliance on a district court case, *AbbVie Inc. v. Bailey*, No. 24-cv-00996, 2025 WL 1918948 (E.D. Mo. July 11, 2025), is misplaced. Defendants argue that 340B abuses produce the injuries to PhRMA's members, not S.B. 71. But Defendants ignore the differing arguments made. There, plaintiff argued use of the "product replenishment model" produced an uptick in diversion and 340B-priced sales. *Id.* at *6. Plaintiff did *not* argue the *Missouri law* produced additional 340B-priced drug sales. Similarly, the court relied heavily on a purported concession from plaintiff that it would provide *the same* number of 340B-priced drugs without the Missouri law. *Id.* at *8.

Here, PhRMA alleges S.B. 71 forces manufacturers to provide many more 340B-priced drugs than otherwise required. Compl. ¶¶ 85-92, 142-45. That is textbook Article III injury.[2] Even under Defendants' argument, manufacturers must deliver 340B drugs to *more* locations at their own expense, 42 U.S.C. § 256b(a)(8). That is also Article III injury.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

[2] Defendants' reliance (at 7-8) on *AHM* is also wrong. Defendants cite analysis regarding the group's assertion of organizational standing. 602 U.S. at 394. The relevant ruling on associational standing was predicated on other grounds: unlike here, individual members had not, and would not, suffer injury from the challenged action. *Id.* at 385-393 (explaining the law did not "require[] the plaintiffs to do anything or to refrain from doing anything").

Dated: October 17, 2025

Respectfully submitted,

*s/ Philip J. Perry*

Philip J. Perry
Andrew D. Prins
Abid R. Qureshi
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

Joel S. Neckers
Riley C. Collins
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Tel: (303) 244-1800
Fax: (303) 244-1879
neckers@wtotrial.com
rcollins@wtotrial.com

*Attorneys for Plaintiff Pharmaceutical Research and Manufacturers of America*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on the 17th day of October, 2025, the above and foregoing document, Plaintiff's Opposition to Defendants' Motion to Dismiss, was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record:

*Attorneys for: Philip J. Weiser*

*Joseph Michael*
Joseph.Michaels@coag.gov

*Jennifer Hunt*
Jennifer.Hunt@coag.gov

*Robin Alexander*
Robin.Alexander@coag.gov

*Lily Nierenberg*
Lily.Nierenberg@coag.gov

*Zach Fitzgerald*
zach.fitzgerald@coag.gov

*Attorneys for: Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel*

*Jennifer Johnson*
Jennifer.Johnson@coag.gov

*Zach Fitzgerald*
zach.fitzgerald@coag.gov

*s/ Philip J. Perry*